**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Health Care Cost Containment System,<br><br>   Plaintiff,<br><br>v.<br><br>Centers For Medicare and Medicaid Services, et al.,<br><br>   Defendants. | No. CV-17-04462-PHX-DJH<br><br>**ORDER** |

  This matter is before the Court on an appeal by Plaintiff, Arizona Health Care Cost Containment System ("AHCCCS"), against Defendants, the United States Department of Health and Human Services, by and through its Centers for Medicare and Medicaid Services, and the Secretary of the United States Department of Health and Human Services, in his official capacity (collectively "HHS"). AHCCCS is appealing from a decision by the Health and Human Services Departmental Appeals Board disallowing $11,716,850 in federal financial participation for claimed school-based administrative costs. (Doc. 1).

  AHCCCS filed an Opening Brief (Doc. 30), HHS submitted an Answering Brief (Doc. 34), and AHCCCS filed a Reply Brief (Doc. 35).

**I. Background**

  Under the Social Security Act, states are eligible to receive federal reimbursement, referred to as "federal financial participation," for school-based administrative activities that support Medicaid-eligible school children under the Individuals with Disabilities

Education Act. (Doc. 17-3 at 1-3). For the period between January 2004 and September 2008, AHCCCS claimed $30,584,822 as federal financial participation for school-based administrative activities (Doc. 17-3 at 4); this amount was originally fully paid to AHCCCS (Doc. 30 at 8).

In October 2008, the Health and Human Services Office of the Inspector General informed AHCCCS that it was conducting an audit of Arizona's contingency fee payment arrangements with consultants for claiming school-based administrative costs; in March 2011, the objective of the audit was "revised" to focus on AHCCCS's actual claims for school-based administrative costs. (Doc. 17-5 at 109-110; Doc. 17-5 at 143-144). Following these audits, the Office of the Inspector General disallowed $11,716,850 in federal funding for claimed school-based administrative costs. (Doc. 17-5 at 152). It disallowed $6,295,139 of this amount based upon AHCCCS's data-collection method for school-based administrative costs. (Doc. 17-5 at 152, 163-166). It disallowed the remaining $5,421,711 because it found that AHCCCS failed to maintain all needed claim substantiation documents for the first quarter of 2004 and the second quarter of 2005. (Doc. 17-5 at 152, 161-163). AHCCCS appealed this decision to the Department of Health and Human Services Departmental Appeals Board (the "Appeals Board"), which affirmed. (Doc. 17-3 at 1-26).

This Order will first discuss relevant context, including the applicable terms of the 2003 Claiming Guide, which provided guidance to states regarding submitting claims for federal financial participation of school-based administrative costs; AHCCCS's approach to documenting the amounts requested for federal financial participation of school-based administrative costs; the audits of AHCCCS's claims; and the administrative review process in this matter. This Order will next address whether the Appeals Board properly disallowed $6,295,139 based upon AHCCCS's data-collection methodology. Finally, this Order will address whether the Appeals Board properly disallowed $5,421,711 for AHCCCS's failure to fully substantiate its claims during the 2011 audit.

…

### A. The Claiming Guide

In a May 2003 publication, the Centers for Medicare and Medicaid Services ("CMS") issued a Medicaid School-Based Administrative Claiming Guide (the "Claiming Guide") (Doc. 17-5 at 1-61). The Claiming Guide outlines acceptable methods for accurately assessing time spent on administrative activities. (Doc. 17-5 at 44). It noted that "one of the most commonly used sampling methodologies for time studies is random moment sampling" ("RMS") and that the "RMS method represents an acceptable method for accurately assessing the time spent on administrative activities." (Doc. 17-5 at 44). The Claiming Guide acknowledged that there was some flexibility in the sampling methodology, but stated that the methodology must remain statistically valid and that the methodology must be acceptable to CMS:

> Flexibility is afforded within the bounds of statistical validity. However, the validity and reliability of the sampling methodology must be acceptable to CMS. That is, the state must include details of how its time study methodology will be validated.

(Doc. 17-5 at 45).

The Claiming Guide next addressed the use of over-sampling and non-responses in the time study methodology. (Doc. 17-5 at 45). Although it recognized that oversampled responses are sometimes substituted for responses that were not received, it cautioned against substituting oversampled responses for completed responses when there were few reported Medicaid activities:

> To ensure an adequate number of responses, many schools oversample and/or factor in a non-response rate in their time study methodology. Under this methodology, oversampled responses are sometimes substituted for responses not received. However, oversampled responses should not be substituted for completed responses in which there are no or few reported Medicaid activities in order to increase the Medicaid reimbursable portion of the claim. No completed responses should be deleted or ignored.

(Doc. 17-5 at 45).

Finally, with respect to claiming methodology, the Claiming Guide indicated that it is potentially problematic for employees who do not perform many Medicaid activities to fail to complete the time-study; in order to avoid such problems, non-responses must be

coded to non-Medicaid time study codes:

> Another potential problem is employees who are instructed to not complete the time study if they typically do not perform many Medicaid activities. *To avoid this, all non-responses should be coded to non-Medicaid time study codes*.

(Doc. 17-5 at 45 (emphasis added)).

### B. Arizona's Approach

In a January 2004 document entitled, "Medicaid Administrative Claiming Program Guide; DRAFT – Pending CMS Approval," AHCCCS described its proposed methodology for collecting the sampling to establish the amount of time spent on administrative activities. (Doc. 17-5 at 63-73). The proposed methodology stated that forms would be marked invalid if they contained missing or inaccurate information or if the form was not approved; invalid forms would then be removed from the sample pool of observation forms:

> Forms that cannot be validated, due to missing or inaccurate information, or failure [to] return the updated form will be marked invalid. Once all invalid forms have been extracted from the sample pool of observation forms, all valid forms are included in the tabulation.

(Doc. 30 at 12; Doc. 17-5 at 72-73).

On March 23, 2004, via e-mail, AHCCCS submitted its proposed claiming plan for the Medicaid School-Based Program for CMS's review and approval. (Doc. 17-5 at 100). The transmittal e-mail stated that "[t]he guide has been prepared in accordance with the CMS May 2003 Guide and in response to AHCCCS'[s] change of contractor." (Doc. 17-5 at 100). Apparently not hearing back from CMS regarding the proposed plan, AHCCCS e-mailed CMS in November 2004; AHCCCS asked whether there was "any information regarding the status of the AHCCCS claiming guide review/approval process." (Doc. 17-5 at 99). In response, Kenneth Adams of CMS indicated possible, but not official, approval of the plan, based upon AHCCCS's representation that the plan was consistent with the Claiming Guide:

> I forwarded Arizona's School-Based Admin claiming plan to CO[1] right after I received it from you on March 23, 2004. I have not heard from CO and

---
[1] The record is unclear regarding the identity of "CO."

- 4 -

> confess I also have not had an opportunity to review it closely – but other staff indicated it looks good, but they have a few questions;
>
> Until such time as we formally approve AHCCCS'[s] plan we are relying on your statement in the transmittal e-mail that says AHCCCS's program was prepared in accordance with the May 2003 CMS guide.

(Doc. 17-5 at 99). CMS never approved or disallowed AHCCCS's 2004 proposed plan, which remained in place until AHCCCS modified the plan in May 2008. (Doc. 17-5 at 107).

AHCCCS made the May 2008 modification in response to an April 22, 2008, recommendation by its contractor, Maximus. In its recommendation, Maximus noted that, although the Claiming Guide was "arguably . . . contrary" to "other federal guidance" regarding non-responses, "AHCCCS treats 'non-responses' differently than the CMS Guide requires.'" (Doc. 17-5 at 103, 107).

### C. AHCCCS Claims Audits–Sampling Errors and Unretained Documents

On October 20, 2008, the Health and Human Services Office of the Inspector General (the "OIG") notified AHCCCS that it intended to audit AHCCCS's contingency fee agreements with consultants for claiming school-based administrative costs (the "2008 audit"). (Doc. 17-5 at 109-110). The specific stated objectives were to:

> determine the (1) extent to which the Arizona Health Care Cost Containment System (AHCCCS) has contracted with consultants through contingency fee payment arrangements and (2) impact of these arrangements on the submission of improper claims to the Federal Government.

(Doc. 17-5 at 109). The audit period was from January 1, 2004, through June 30, 2008. (Doc. 17-5 at 109). An attachment to the notification letter detailed the documents requested. (Doc. 17-5 at 111-112). Examples of the requested documents include AHCCCS policies regarding school-based administrative claims and copies of contracts between AHCCCS and Maximus. (Doc. 17-5 at 111-112). The 2008 audit also requested "Quarterly amount claimed by AHCCCS for Federal financial participation for Medicaid school-based administrative expenditures (in an Excel file)." (Doc. 17-5 at 112). The 2008 audit notification letter further stated that, "we will also need access to additional documents and records"; the letter did not specify which additional documents and records

would be needed. (Doc. 17-5 at 109).

The OIG issued a second intent to audit notification letter to AHCCCS on March 11, 2011 (the "2011 audit"). (Doc. 17-5 at 143-144). The "purpose" of that letter was to notify AHCCCS of the OIG's "intention to conduct an audit of Medicaid school-based administrative costs claimed by the State of Arizona." (Doc. 17-5 at 143). The stated objective was to "determine whether [AHCCCS] claimed Medicaid administrative costs for the school-based program in accordance with Federal regulations and guidance." (Doc. 17-5 at 143). The letter then linked the school-based administrative costs audit to the October 2008 audit of AHCCCS's contingency fee agreements with consultants for claiming school-based administrative costs:

> We initially started this review as part of a nationwide survey of Medicaid contingency fee payment arrangements. . . . After discussion with Centers for Medicare & Medicaid Services officials and OIG management, we have revised our objective to focus on AHCCCS'[s] claiming of Medicaid administrative costs for the school-based programs.

(Doc. 17-5 at 143).

In a January 2013 Report, the OIG disallowed $11,716,850 from the $30,545,822 that AHCCCS claimed as the Federal share of school-based administrative costs. (Doc. 17-5 at 152). The OIG found that $6,295,139 of this amount was unallowable based upon AHCCCS's Random Moment Time Sampling method. (Doc. 17-5 at 152). The OIG determined that AHCCCS "inappropriately discarded sample items when calculating the statewide Medicaid percentages." (Doc. 17-5 at 152). The OIG reasoned that AHCCCS reduced the sample size when it discarded items; the reduced sample size resulted in higher Medicaid percentages, which therefore increased the amount of Federal reimbursement. (Doc. 17-5 at 164).

The OIG disallowed the remaining $5,421,711 because, for two out of the nineteen quarters considered—the first quarter of 2004 and the second quarter of 2005—AHCCCS did not maintain documentation to support "(1) the universes of total available moments in time and RMTS participants and/or (2) the sample of random moments for selected participants." (Doc. 17-5 at 152). In reaching this conclusion, the OIG stated that

AHCCCS provided copies of completed observation forms,[2] but "did not provide data files to support the sample universe determination and the sample selection." (Doc. 17-5 at 162). The OIG stated that, without the files, it could not determine whether the provided observation forms were for the sample items selected for those two quarters. (Doc. 17-5 at 163). As a result, the OIG disallowed all claimed reimbursement for the first quarter of 2004 and the second quarter of 2005. (Doc. 17-5 at 161-163).

### D. The Administrative Review Process

On March 4, 2013, AHCCCS responded to the OIG report, disagreeing with the recommendation that AHCCCS refund $11,716,850 in federal reimbursement for school-based administrative costs. (Doc. 17-5 at 179-180). By letter dated October 20, 2016, HHS formally disallowed the $11,716,850 in claimed federal financial participation for school-based administrative costs. (Doc. 17-5 at 182-187). AHCCCS submitted a Request for Reconsideration to the Secretary of the Department of Health and Human Services on December 14, 2016. (Doc. 17-5 at 189-201). In its Request for Reconsideration, AHCCCS: (1) argued that the disallowance for purported methodological issues was "unfounded and unfair" because it was based upon AHCCCS's lack of explicit methodology (Doc. 17-5 at 194), and (2) acknowledged that Maximus "was unable to provide the supporting documentation" for the two quarters at issue, but argued that disallowing the entire amount claimed was "unreasonable and unduly punitive" (Doc. 17-5 at 193). On February 14, 2017, CMS issued its decision on AHCCCS's request for reconsideration. (Doc. 17-5 at 204-205). CMS affirmed the disallowance. (*Id.*).

AHCCCS filed a Notice of Appeal with the Department of Health and Human Services on April 3, 2017. (Doc. 17-5 at 207-208). On October 2, 2017, the Appeals Board issued its decision. (Doc. 17-3 at 1 – 26). The Board upheld the $11,716,850 disallowance. (Doc. 17-3 at 1).

AHCCCS now asks this Court to reverse the Departmental Appeals Board decision

---

[2] For the first quarter of 2004, AHCCCS provided copies of 3,559 filled-out observation forms and, for the second quarter of 2005, AHCCCS provided copies of 3,730 filled-out observation forms. (Doc. 17-5 at 162-163).

and set aside the disallowances that were upheld by that decision. (Doc. 1). Based upon the parties' Stipulation (Doc. 10), this Court ordered that, as an administrative appeal, this case is excluded from the Mandatory Initial Discovery Pilot and that no discovery would be conducted. (Doc. 11). AHCCCS filed an Opening Brief (Doc. 30), HHS filed an Answering Brief (Doc. 34), and AHCCCS filed a Reply Brief (Doc. 35)

## II. Discussion

### A. Standard of Review

This Court reviews the HHS Departmental Appeals Board decision under the Administrative Procedure Act (the "APA"), 5 U.S.C. § 551 *et seq.* Under the APA, the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The agency's decision is "presumptively valid; the plaintiff bears the burden of showing otherwise." *Texas Tech Physicians Assocs. v. United States Dep't of Health and Human Services*, 917 F.3d 837, 844 (5th Cir. 2019).

The Court must defer to agency regulations that present a reasonable interpretation of an ambiguous statute. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-44 (1984). An agency's interpretation of its own regulation is similarly entitled to deference. *Auer v. Robbins*, 519 U.S. 452, 461 (1997). However, agency interpretations that "lack the force of law," such as those in opinion letters, policy statements, agency manuals, and enforcement guidelines, "do not warrant *Chevron*-style deference." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000). Such interpretations are "'entitled to respect' . . ., but only to the extent that those interpretations have the 'power to persuade.'" *Id.* (internal citations omitted).

### B. Disallowance Based Upon Reporting Method

The Appeals Board upheld the $6,295,139 sampling methodology disallowance because "CMS did not unreasonably interpret the [Claiming Guide] after the fact" and because "Arizona discarded responses when the [Claiming Guide] then in effect did not

specifically permit such action and without CMS approval."³ (Doc. 17-3 at 16). AHCCCS argues that this Court should reverse this disallowance because the disallowance rationale was based on an unannounced and subjective standard that CMS has not always applied; because CMS failed to provide a reasoned basis for the disallowance; and because AHCCCS should have been permitted to rely on its proposed methodology in light of CMS's failure to notify AHCCCS that the methodology was not acceptable. (Doc. 30 at 12-25). In response, HHS states that this Court should uphold the disallowance because the Claiming Guide required AHCCCS to include non-responses in its sample and because CMS never approved the sampling methodology. (Doc. 34 at 8-12). As explained below, the Court affirms this disallowance because, based upon the administrative record, the Appeals Board decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

The Claiming Guide was provided to state agencies and schools to explain the acceptable process and methodology for claiming federal reimbursement for school-based administrative costs. Specifically, the Claiming Guide stated that its purpose was to "inform schools, state Medicaid agencies, and other interested parties on the appropriate methods for claiming federal reimbursement for the costs of Medicaid administrative activities performed in the school setting." (Doc. 17-5 at 5). The Claiming Guide further noted that "[s]tate Medicaid Agencies are responsible for ensuring . . . that claims are submitted to CMS in conformance with such requirements." (Doc. 17-5 at 6). Finally, the Claiming Guide stated that it "does not supersede any statutory or regulatory requirements." (Doc. 17-5 at 6). Instead, "it clarifies and consolidates CMS'[s] guidance on how to meet these statutory and regulatory requirements and explains the application of such requirements in the context of current practices." (Doc. 17-5 at 6).

Regarding capturing the time for administrative Medicaid costs, the Claiming Guide required states to "develop an allocation methodology that is approved" by HHS. (Doc.

---

³ The Appeals Board also affirmed the $6,295,139 sampling methodology disallowance because it found that Arizona failed to demonstrate that it actually interpreted the Claiming Guide language to mean that it could exclude non-responses without obtaining approval from CMS (Doc. 17-3 at 12-15).

17-5 at 12). Different methodologies could be used, including random moment sampling, contemporaneous time sheets, or other "quantifiable measures of employee effort." (Doc. 17-5 at 12). Regardless of the time study method used, the study had to reflect "**all** of the time and activities (whether allowable or unallowable under Medicaid) performed by employees participating in the Medicaid administrative claiming program." (Doc. 17-5 at 12 (emphasis in original)).

Although the Claiming Guide provided for some "flexibility" in terms of claiming methodology, there were express limitations on that flexibility: first, the sampling methodology had to be "within the bounds of statistical validity"; second, "the validity and reliability of the sampling methodology must be acceptable to CMS." (Doc. 17-5 at 45). Other limitations included that "[n]o completed responses should be deleted or ignored" and that "all non-responses should be coded to non-Medicaid time study codes." (Doc. 17-5 at 45).

AHCCCS takes issue with this final limitation requiring all non-responses to be coded to non-Medicaid time study codes. It argues that it rightfully believed that it was acceptable to exclude non-responses based upon the language of the Claiming Guide, as well as past practices, and that its belief was justifiable because it timely communicated its plan to CMS, which never suggested that the plan was unacceptable. (Doc. 30 at 21). The Appeals Board rejected this argument, reasoning that AHCCCS's proposed plan did not conform to the Claiming Guide because its proposal excluded "certain types of responses considered invalid" and "essentially sought approval to deviate from the general rule of including all responses." (Doc. 17-3 at 17). The Appeals Board further found that the Claiming Guide could be interpreted to permit the exclusion of non-responses, but only "*with an approved protocol to support it*." (Doc. 17-3 at 16 (emphasis added)). Because CMS never approved the plan and because the plan excluded certain non-responses, the Appeals Board concluded that the claims were "properly disallowed for improperly excluding non-responses or incomplete or inaccurate responses." (Doc. 17-3 at 19). This Court agrees.

First, when looking at the language of the Claiming Guide, AHCCCS's program was not prepared in accordance with the Guide. Under the Claiming Guide, the default for incomplete forms was to include the form as non-Medicaid: "Another potential problem is employees who are instructed to not complete the time study if they typically do not perform many Medicaid activities. *To avoid this, all non-responses should be coded to non-Medicaid time study codes*." (Doc. 17-5 at 45 (emphasis added)). Under AHCCCS's plan, however, if there was a problem with a form, the default was to exclude the form from consideration. The plan stated that forms would be marked invalid if there was missing information, inaccurate information, or a failure to return the form; these "invalid forms" would then be "extracted from the sample pool of observation forms." (Doc. 17-5 at 72-73). In other words, if a form was not returned, was missing information, or contained inaccurate information, that form would be excluded from the tabulation. After those invalid forms were excluded, the remaining valid forms would be used for the tabulation. (Doc. 17-5 at 72-73). Therefore, AHCCCS's methodology of excluding invalid forms contradicts the Claiming Guide's express language.

Second, CMS did not approve AHCCCS's proposed plan. AHCCCS correctly states that it followed appropriate procedures by presenting CMS with the proposed plan. AHCCCS similarly correctly states that CMS never disapproved the plan based on the way the plan handled non-responses; lack of disapproval, however, is not approval. In the communication from Kenneth Adams of CMS to AHCCCS, Mr. Adams acknowledged that he had forwarded the claiming plan once he received it, that he had "not heard" back about the plan, and that he has "not had an opportunity to review it closely." (Doc. 17-5 at 99). While he did say that "other staff indicated it looks good," he tempered this statement with the caveat that "they have a few questions." (Doc. 17-5 at 99). Notably, he indicated that, until CMS formally approves the plan, CMS is "relying on your statement in the transmittal e-mail that says AHCCCS's program was prepared in accordance with the May 2003 CMS guide." (Doc. 17-5 at 99). As discussed above, however, AHCCCS's plan directly contradicted the express language of the Claiming Guide; therefore, contrary to

AHCCCS's representation in its transmittal email to Mr. Adams, the plan could not have been "prepared in accordance" with the Claiming Guide.

Further, while the reasons for CMS's delay in either approving or disapproving the proposed plan are unclear,[4] CMS's silence cannot be considered a concession that the plan was acceptable because the Claiming Guide stated that CMS approval was required: "Flexibility is afforded within the bounds of statistical validity. However, the validity and reliability of the sampling methodology must be acceptable to CMS." (Doc. 17-5 at 45). Based on this language, the Appeals Board correctly found that AHCCCS was not entitled to interpret CMS's silence as approval of its proposed plan.

Finally, AHCCCS suggests that it nonetheless properly used its claiming methodology because some approved state methodologies, including AHCCCS's 2010 plan, allow non-responses to be discarded. (Doc. 30 at 14-16). As recognized by the Appeals Board, the problem with this argument is that "the parallel goals of statistical validity and claim integrity" only allow exclusion of non-responses when there is "an approved protocol." (Doc. 17-3 at 16). Arizona's revised, approved protocol is much more detailed regarding non-responses than the proposed 2004 plan and therefore, as found by the Appeals Board, "differs materially from the draft 2004 plan, to ensure a valid sample size."[5] (Doc. 17-3 at 18). Accordingly, because AHCCCS's proposed plan treated non-responses differently from the Claiming Guide instructions, because CMS approval was required to ensure statistical validity, and because AHCCCS implemented the plan without obtaining CMS approval, this Court affirms the Appeals Board's decision disallowing $6,295,139 based upon Arizona's Random Moment Time Sampling method.

---

[4] The Appeals Board suggests that "[s]ince CMS never approved Arizona's 2004 plan, *as drafted*, it is reasonable to infer that CMS had concerns or reservations" about the 2004 plan. (Doc. 17-3 at 18 (emphasis in original)). Further, the Appeals Board found that, CMS's approval of Arizona's modified plan "strongly suggests that CMS had concerns about a matter relevant to statistical validity that the 2004 plan did not adequately or specifically address." (Doc. 17-3 at 18).

[5] The 2010 plan states "[Arizona] will require an 85% return rate. Non-responsive moments, moments not returned or not accurately completed and subsequently resubmitted . . . will not be included in the results unless the return rate for valid moments is less than 85%. If the return rate of valid moments is less than 85%, then, non-returned moments will be included and coded as a non-allowable." (Doc. 17-3 at 18).

- 12 -

## C. Disallowance Based Upon Failure to Retain Documentation

The Appeals Board also upheld a $5,421,711 disallowance based upon AHCCCS's failure to retain supporting claim documentation from the first quarter of 2004 and the second quarter of 2005. It reasoned that AHCCCS improperly failed to maintain documentation to support its claims for those quarters and that, without the documentation, AHCCCS could not substantiate any of its claims for those quarters. (Doc. 17-3 at 23-25). AHCCCS asserts this Court should reverse that decision because, although underlying documents were admittedly missing at the time of the 2011 audit, AHCCCS was not required to retain those documents until the 2011 audit; therefore, according to AHCCCS, the Appeals Board decision is arbitrary and capricious and should be reversed. (Doc. 30 at 27-29). HHS argues that the disallowance was rational because AHCCCS was obligated to substantiate its claims regardless of any document retention guidelines and because, in any event, AHCCCS had sufficient notice that its claims were being challenged and therefore should have retained the records. (Doc. 34 at 12-14). As explained below, the Court affirms this disallowance because, based upon the administrative record, AHCCCS should have retained the needed supporting documentation until all audits were resolved; because AHCCCS failed to retain the documents and could not substantiate its claims for those two quarters, the Appeals Board decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

In general, claim documents must be retained for a minimum of three years; if there is an audit of a claim, this period is extended until the audit is resolved. 42 C.F.R. § 433.32; 45 C.F.R. § 75.361. The Code of Federal Regulations, regarding State Fiscal Administration and Federal Matching and General Administration Provisions, provides that state Medicaid agencies, as well as local agencies administering the plan, must "[r]etain records for 3 years from date of submission of a final expenditure report." 42 C.F.R. § 433.32(b). Likewise, regarding Post Federal Award Requirements, the Code of Federal Regulations states that "[f]inancial records, supporting documents, statistical records, and all other non-Federal entity records pertinent to a Federal award must be

retained for a period of three years from the date of submission of the final expenditure report or, for Federal awards that are renewed quarterly or annually, from the date of the submission of the quarterly or annual financial report." 45 C.F.R. § 75.361. However, if an "audit is started before the expiration of the 3-year period, the records must be retained until all litigation, claims, or audit findings involving the records have been resolved and final action taken." 45 C.F.R. § 75.361(a); *see also* 42 C.F.R. § 433.32(c) (stating that agencies must "[r]etain records beyond the 3-year period if audit findings have not been resolved").

In order to determine the ending date of the three-year documentation retention period for the first quarter of 2004 and the second quarter of 2005, and to therefore determine whether AHCCCS was obligated to maintain the missing documentation at the time of the 2011 audit, the Court must first determine the starting dates of those three-year periods. Based on the record, it is unclear exactly when AHCCCS filed its claims for the first quarter of 2004 and the second quarter of 2005. Pursuant to 42 U.S.C. § 1320b-2(a), states must file claims "within the two-year period which begins on the first day of the calendar quarter immediately following such calendar quarter." 42 U.S.C. § 1320b-2(a). Therefore, claims for the first quarter of 2004 must have been submitted by April 1, 2006, and claims for the second quarter of 2005 must have been submitted by July 1, 2007.[6] Based upon the three-year document retention period from those dates, AHCCCS must have retained the documents from the first quarter of 2004 until April 1, 2009, and must have retained documents from the second quarter of 2005 until July 1, 2010.[7]

If an audit is started before the end of the three-year document retention period, the records must be retained until the audit is resolved and final action has been taken. 45

---

[6] Because AHCCCS did not submit evidence of the exact claim submission dates, the Court will analyze this issue using the latest dates on which AHCCCS could have supported the claims.

[7] CMS asserts that a five-year, not three-year, document retention policy applies based upon AHCCCS's own 2004 plan, which required Maximus to retain the time study records for no less than five years. (Doc. 34 at 13). Based on this Court's decision, it is unnecessary to address whether the federal three-year document retention requirement applies or whether the claimed internal five-year document retention policy applies.

C.F.R. § 75.361(a) ("the records must be retained until all litigation, claims, or audit findings involving the records have been resolved and final action taken"); *see also* 42 C.F.R. § 433.32(c) (agencies must "[r]etain records beyond the 3-year period if audit findings have not been resolved"). In the present case, the 2008 audit was initiated on October 20, 2008, which was before the end of the three-year document retention period for both the first quarter of 2004 and the second quarter of 2005. Therefore, AHCCCS was required to retain all documents related to the 2008 audit until that audit was resolved. In contrast, the 2011 audit was initiated after expiration of the three-year document retention period. Therefore, unless the 2008 audit was broad enough to encompass the missing documents that were required for the 2011 audit, AHCCCS was not obligated to maintain those documents beyond the three-year period. Accordingly, resolution of this issue turns upon whether the 2008 audit was sufficiently broad enough to encompass the 2011 audit.

The Court agrees with the Appeals Board, which found that the 2008 audit notice "plainly" announced that it would examine "whether federal funds were properly claimed" and therefore found that the 2008 audit notice put AHCCCS on notice that it would need to retain substantiating claim documentation. (Doc. 17-3 at 21-22). The stated purpose of the 2008 audit was to "determine the (1) extent to which [AHCCCS] has contracted with consultants through contingency fee payment arrangements and (2) *impact of these arrangements on the submission of improper claims to the Federal Government*." (Doc. 17-5 at 109 (emphasis added)). This essentially means, with respect to AHCCCS, that the audit was intended to examine the contingency fee payment arrangements between AHCCCS and its contractor Maximus and was intended to determine if the contingency fee arrangement impacted the submission of improper claims. Attached to the audit notice was a list of documentation requested in connection with the audit; those documents included "Quarterly amounts claimed by AHCCCS for Federal financial participation for Medicaid school-based administrative expenditures (in an Excel file)." (Doc. 17-5 at 112).

On March 11, 2011, the OIG presented a second audit letter to AHCCCS, this time indicating that it was specifically examining the school-based administrative costs claimed

by the State of Arizona. (Doc. 17-5 at 143). In doing so, it stated that it had "revised" its prior audit to focus on the claimed administrative costs, rather than the contingency fee payments. (*Id.*).

Although the 2008 audit did not specifically focus on the validity of the school-based administrative claims, the language of the notice letter was broad enough to put AHCCCS on notice that it needed to retain the administrative claim supporting documents until the 2008 audit was resolved. First, the 2008 audit encompassed Arizona's contingency fee agreements with consultants for claiming "school-based administrative costs." (Doc. 17-5 at 109). The claims at issue are for these school-based administrative costs. Second, the 2008 audit notice stated that one of its purposes was to examine the impact of contingency fee arrangements "on the submission of improper claims to the Federal Government." (Doc. 17-5 at 109). When considering this language together, the audit notice indicated that the audit would include school-based administrative costs and would necessarily need to encompass whether claims were improperly submitted for those costs. Thus, as recognized by the Appeals Board (Doc. 17-3 at 21-22), once AHCCCS received the notice, it was required to retain all documents related to the audit until the audit was resolved. *See* 45 C.F.R. § 75.361; 42 C.F.R. § 433.32(c).

AHCCCS suggests that it did not need to retain the documents underlying the claims submissions because those documents were not included in the list of documents attached to the 2008 audit notice. Instead, the notice merely asked for a spreadsheet of quarterly amounts claimed by AHCCCS during the period from 2004 to 2008. (Doc. 30 at 27). Although the list of items did request such a spreadsheet, the audit further stated that "we will also need access to additional documents and records." (Doc. 17-5 at 109, 112). This language demonstrates that the provided list was not an exclusive list. Therefore, the 2008 audit letter placed AHCCCS on notice that all documents related to the audit needed to be retained until that audit was resolved. Because that audit was never resolved, but was instead modified into the 2011 audit, AHCCCS should have continued to maintain the documents through resolution of the 2011 audit.

Finally, AHCCCS argues that, even if it had been required to maintain the missing documents, it is "unreasonable and punitive" for CMS to disallow all amounts claimed for the first quarter of 2004 and the second quarter of 2005. (Doc. 30 at 29-32). AHCCCS asks this Court to instead only permit disallowance of an amount proportionate to the percentage of claims disallowed during the 17 quarters for which AHCCCS provided the necessary supporting documentation. (*Id.*). It reasons that, because only a small percentage was disallowed from the remaining quarters, it is disproportionately punitive to disallow 100% of the claims from the two quarters in question. (*Id.*). The Appeals Board rejected this argument, finding that the "disallowance of [federal financial participation] for failure to substantiate the claims is not intended to punish the state agency." (Doc. 17-3 at 24). Instead, the "issue is whether federal funds have been properly paid to a claimant in accordance with applicable requirements." (Doc. 17-3 at 24). Therefore, the disallowance was based on CMS's finding that AHCCCS could not substantiate any of its claims for those two quarters because it admittedly failed to retain and to produce the underlying random moment time sampling records for those quarters. (Doc. 17-3 at 25). Accordingly, the Appeals Board concluded that "Arizona has not carried its burden to show that the audit findings were not substantiated." (Doc. 17-3 at 25). Finally, the Appeals Board stated that, to the extent that Arizona's request for a reduced disallowance may be considered a request for equitable relief, it could not provide such relief because it is not authorized to issue equitable relief. (Doc. 17-3 at 25).

This Court finds that, based on the record provided, the Appeals Board decision was not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. As stated by the OIG, and as recognized by the Appeals Board, the disallowance was based upon the OIG's inability to determine the proper amount for reimbursement because AHCCCS failed to substantiate its claims for those two quarters during the audit:

> Without these files, we could not determine whether the observation forms that the State agency provided were for the sample items selected for those two quarters. Because the State agency was unable to provide required documentation of the sample universe determination and/or sample selection, the Federal reimbursement for school-based administrative costs for those quarters was unallowable.

(Doc. 17-5 at 163; *see also* Doc. 17-5 at 183-184).  Therefore, because AHCCCS was obligated to maintain all required supporting documents once it had notice of the audit and because the OIG could not determine the proper claim amount without all supporting documents, the Court affirms the Appeals Board decision finding that that the $5,421,711 was properly disallowed.

### III. Conclusion

The Court finds that the Departmental Appeals Board's decision was neither arbitrary and capricious nor an abuse of discretion.  Accordingly,

**IT IS ORDERED** affirming the October 2, 2017, Decision of the Department of Health and Human Services Departmental Appeals Board.

**IT IS FURTHER ORDERED** dismissing the administrative appeal and directing the Clerk to enter judgment accordingly.

Dated this 14th day of February, 2020.

Honorable Diane J. Humetewa
United States District Judge